**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Claud Sloan, | ) | |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW, AND ORDER FOR JUDGMENT** |
| vs. | ) | |
| | ) | |
| Hartford Life and Accident | ) | |
| Insurance Company, a foreign | ) | Case No. 1:05-cv-014 |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

A bench trial in this matter was scheduled to commence on Friday, January 13, 2006, in Bismarck, North Dakota. The parties opted to forego a bench trial in favor of proceeding to trial on the briefs and a stipulated fact record. The stipulated record consists of the "administrative record." See Docket No. 15, Exhibit No. 28. No testimony was offered.


I.    **MOTION FOR INTRODUCTION OF ADDITIONAL EVIDENCE**

In addition to the administrative record, the plaintiff, Claud Sloan, seeks to admit additional evidence as set forth in his "Motion for Introduction of Additional Evidence" filed on October 31, 2005.[1]  The additional evidence stems from a favorable Social Security decision issued by Administrative Law Judge Donald Holloway on December 12, 2003, finding that Sloan was entitled to disability benefits beginning on February 5, 1987. See Docket No. 1, Exhibit Number 5. The additional evidence includes the ALJ's decision, the exhibits admitted as evidence incident to that

_____

[1]Sloan originally filed the motion in conjunction with a motion for summary judgment filed on October 31, 2005. See Docket No. 11. On December 2, 2005, the Court denied the motion for summary judgment, but declined ruling on the motion for introduction of additional evidence. See Docket No. 19.

decision, and the "Notice of Decision - Fully Favorable." See Docket No. 1, Exhibit Nos. 4 & 5; Docket No. 11 (Additional Evidence I and Additional Evidence II). The defendant, Hartford Life Accident Insurance Company (Hartford Life), opposes the motion.

It is well-established that "[w]hen a de novo standard of review applies, a district court has more discretion to allow the parties to introduce evidence in addition to that submitted to the plan decision-maker." McKeehan v. Cigna Life Ins. Co., 344 F.3d 789, 793 (8th Cir. 2003) (citing Donatelli v. Home Ins. Co., 992 F.2d 763, 765 (8th Cir. 1993)). The district court may admit evidence outside the record in a case involving the denial of ERISA benefits if the participant shows good cause. Ferrari v. Teachers Inc. & Annuity Ass'n, 278 F.3d 801, 807 (8th Cir. 2002) (citing Brown v. Seitz Foods, Inc. Disability Benefit Plan, 140 F.3d 1198, 1200 (8th Cir. 1998)).

Having carefully reviewed the entire record, the Court finds that Sloan has demonstrated good cause for admission of the additional evidence presented. As previously explained, the additional evidence consists of a favorable decision by an ALJ finding Sloan to be entitled to disability benefits beginning on February 5, 1987, the exhibits admitted as evidence incident to that decision, the "Notice of Decision - Fully Favorable," and the "Notice of Award." See Docket No. 1, Exhibit Nos. 4, 5, & 6; Docket No. 11 (Additional Evidence I and Additional Evidence II). There are several factors that justify receipt of the additional evidence.

First, Sloan's original ERISA action against Hartford Life was dismissed for the specific purpose of allowing Sloan to pursue his Social Security disability claim. Second, the definition of disability under Social Security and the long-term disability plan endorsed by Hartford Life are very similar. Third, Sloan's subjective pain complaints and the ALJ's decision finding such complaints to be credible, both of which are included as part of the additional evidence, are highly probative of

2

the ultimate question of disability in this matter.  Finally, the length of time that Sloan was considered

disabled under the long-term disability plan (nearly 13 years) warrants the receipt of the additional

evidence.  Each of these factors will be described in detail in the findings of fact.  As a result, the

Court grants Sloan's "Motion for Introduction of Additional Evidence."  (Docket No. 11).


## II.    <u>FINDINGS OF FACT</u>

The plaintiff, Claud Sloan, was hired by ANG Coal Gasification Company (ANG), on July

11, 1983.  <u>See</u> Complaint, ¶ 6.  Effective November 1, 1985, Confederation Life Insurance Company

issued a long-term disability plan (LTD Plan) for ANG employees.  (AR 809).  The LTD Plan

contains a provision regarding "Total Disability or Totally Disabled" which provides, in relevant part,

as follows:

> An Employee will be considered Totally Disabled if, as a direct result of an Injury or Sickness, he is unable to perform the essential duties of his Normal Occupation[2] for any employer.  However, after Monthly Benefits are payable for 24 months, an Employee will be considered Totally Disabled only if he is unable to perform the essential duties of any occupation for which he is or may become suited based on his education, training, or experience, including any education, training or experience received through a Rehabilitative Program.  Proof of Total Disability will be satisfactory if it (1) is in writing and (2) consists of all medical, psychological, educational and vocational information which the Insurance Company considers pertinent to the claim.  After a Totally Disabled Employee has received Monthly Benefits for 6 months, the Insurance Company may require that he submit, at such intervals as necessary, satisfactory proof of the continuance of a disability.

(AR 817) (footnote added).

On December 31, 1985, Sloan sustained serious injuries when a hydraulic door came down

on the back of his head and neck, fracturing his vertebrae at the C3 level.  (AR 76 and 273).  After

---

[2]"Normal Occupation" is defined by the LTD Plan as "the occupation, job or work he performed at the time he stopped working just prior to a claim being made under this Policy."  (AR 817).

3

rehabilitation, Sloan continued to work at ANG until February 5, 1987, at which time he stopped working and sought long-term disability benefits under the LTD Plan.  On August 6, 1987, Sloan began receiving benefits as he was deemed unable to perform the duties of "his Normal Occupation" as defined by the LTD Plan.  (AR 273).

On August 5, 1989, after the initial twenty-four (24) months, the definition of total disability changed from "own occupation" to "any occupation."  (AR 817).  Sloan was initially denied long-term disability benefits under the "any occupation" standard.  (AR 271-272).  On appeal, the decision was reversed and Sloan's benefits were reinstated retroactively.  (AR 213).  In the letter informing Sloan of the decision, Confederation Life Insurance Company stated as follows:

> You have made a strong case for Total Disability which could translate well into a Social Security pursuit.  Our definition of Total Disability after 24 months is very similar to the definition used by Social Security.  Since we are admitting Mr. Sloan as Totally Disabled from all occupations, he should reapply for Social Security Disability benefits and pursue it to all levels if necessary.

(AR 213).

In 1997, the administration and liability of the LTD Plan was transferred from Confederation Life Insurance Company to Hartford Life and Accident Insurance Company (Hartford Life).  See Complaint, ¶ 9.  Sloan continued to receive long-term disability benefits after the transfer.

On June 29, 1998, Sloan reported to his treating physician, Dr. Michael Martire.  (AR 1142).  Sloan had done so at least once annually since May of 1994.  (AR 1143-1147).  Over this time period, Dr. Martire's impression remained the same regarding Sloan's condition, namely, that Sloan was suffering from chronic cervical pain.  Dr. Martire consistently stated that Sloan remains disabled from his prior line of work.  (AR 1142-1147).

On June 21, 1999, Sloan again saw Dr. Martire.  (AR 1141).  Dr. Martire noted Sloan's continuing neck pain, but also noted that Sloan was having difficulty sleeping. Dr. Martire prescribed

4

new medication for Sloan's recent bouts of insomnia.  Notes from a followup appointment in August

of 1999 reveal that Sloan's neck pain remained constant, but his insomnia had improved due to the

medication.  (AR 1140).

On July 3, 1999, Sloan completed a personal profile evaluation at the request of Hartford Life.

(AR 1130-1135).  Sloan reported that his condition remained the same since he was placed on

disability in February of 1987, limiting his ability to stand, sit, walk, or turn his head for more than

short periods of time.  (AR 1130).  According to the self-completed evaluation, Sloan was able to

wash dishes, sweep, mow the lawn,[3] shop, and perform other light maintenance around the house and

on his automobiles.  (AR 1130-1131).

On June 1, 2000, Sloan reported to Dr. Martire for an annual examination.  (AR 1139).  As

before, Dr. Martire diagnosed chronic cervical pain with insomnia, with his notes reading as follows:

> Overall the patient is doing approximately the same.  The patient still takes
> Amitriptyline, but not every single night.  He takes Ambien approximately 50 nights
> out of the year.  He is still taking the Darvocet-N 100.  Overall he takes
> approximately 60 tablets a year.  The patient still has difficulty with heavier bending
> and lifting activities, which he avoids as much as possible.

(AR 1139).  Dr. Martire opined that "[t]he patient remains disabled from his prior line of

employment."

In August of 2000, Hartford Life retained Mid-State Claims Service, Inc., to conduct home

surveillance of Sloan.  (AR 836).  Surveillance was completed on August 28, 2000, and August 29,

2000.  The surveillance generated still photographs and a single videotape recording which depicted

Sloan carrying tree branches from the back yard of his home to the front yard.  (AR 838).  The

portion of the video tape submitted to the Court is approximately eleven (11) minutes in length.  The

---

[3]Sloan noted that he could only mow the lawn for about thirty (30) minutes at a time and then must rest.  He
either continues after resting, or completes the mowing the next day.  (AR 1131).

still photographs were taken just prior to the videotape recording.

On August 15, 2000, Sloan underwent a functional capacity assessment at Medcenter One Rehabilitation Center in Bismarck, North Dakota. (AR 1149). The evaluation consisted of thirty-six (36) tasks divided into different sections. Sloan's tested sections included dynamic strength, position tolerance, mobility, and endurance. Upon completion, the occupational therapist concluded as follows:

> Based on the information summarized in the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, the client is capable of performing physical work at the MEDIUM level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. Based on this evaluation we feel that the client can sustain the MEDIUM level of work for an 8-hour day.

(AR 1149). The occupational therapist wrote that prior to returning to work full-time Sloan would benefit from a back conditioning and a flexibility program due to continuing problems in that area. (AR 1160).

On October 17, 2000, Hartford Life sent the completed functional capacity assessment to Sloan's treating physician, Dr. Michael Martire, for review. (AR 859). On October 31, 2000, Dr. Martire responded by way of letter as follows:

> I am responding to your letter dated October 31, 2000. I have reviewed the functional capacity assessment done by Kim Stewart. I overall agree with the functional capacity assessment except it is very important to note the patient is not at the full medium level. The patient is at the very low end of medium. In other words, most medium jobs in the Dictionary of Occupational Titles require lifting up to 50 pounds. Please note, the patient was only able to lift 28 pounds. The patient would, therefore, best fit into the light category according to the Dictionary of Occupational Titles. He still would be unable to work in his prior line of work. Whether or not he would be able to work eight hours a day on a day-in and day-out basis would depend on the exact job that was targeted and the job should specifically fit into all the capabilities as seen per the functional capacity assessment.

(AR 857).

On November 6, 2000, Sloan met with William Moryto, an investigator from Hartford Life,

and provided him with a four (4) page statement concerning his condition. (AR 1099-1102). According to the statement, Sloan's medication regimen included Amitriptyline 50 (one tablet at night), Darvocet (as needed for headaches), and Ambien (as needed for sleep). The statement reads, in relevant part, as follows:

> I am presently under the following treatments or therapy. I recently developed a snapping sound in my neck. This started about two weeks after the FCE. I went to Dr. Martire' and he prescribed physical therapy. I went to therapy in Dr. Martire's building. The therapist's name is Mr. Fisher. Over about a six-week period ending about two weeks ago, I visited the physical therapist four times. The therapist tried exercises, ultrasound therapy, and manual traction therapy. It has not seemed to help.

> My limitations are: Some days are better than others. Anything such as walking can cause jarring. However, on a good day I can walk up to about a mile total. In the summer, I try to do it every day. If I mow the lawn that day, I wouldn't do the walk. Sometimes my walk is only four blocks. I don't do any running. If I do things every other day, I get by pretty good. I get headaches from jarring or moving my head frequently such as driving in heavy traffic. There isn't a day I am not reminded I have the headaches. The headache starts in my neck and up to my right ear. It is mostly centered to the right side of my head. They can become so bad, my eyes will become bloodshot. The pain and the throbbing will incapacitate me. Headaches will last sometimes all day. Once in awhile I will wake in the morning, have moved wrong during the night, and I will have the incapacitating headache. These may occur about 2 or 3 times a month. It depends on what I do.

> I can do some bending. I try to be careful in that area. I can do some reaching as long as I don't do it too often. I can sit for up to an hour to an hour and a half. When I am doing my exercises, I do put on a neck brace and a towel. I do exercises as prescribed by the physical therapist. I do some arm pulls with a rubber device on a door. I spend about thirty to forty-five seconds for each arm. I am trying to strengthen the muscles in my neck. I do two and three-pound weights with my arms out and above my neck. I try to do eight to ten, then if I am doing well, I will come back and try another eight to ten. I do some bench presses using the cervical collar and towel. I use up to thirty pounds. On a good day, I might do up to a total of forty repetitions, but not all at one sitting. Some day, I can only do eight to ten.

> I am able to drive an automobile. I drive Chevrolet Lumina with automatic transmission. I generally drive everyday. If I don't have to turn my head, I do quite well. I was able to drive from my home in Bismarck to this meeting in Grand Forks. I drove yesterday and am I combining this with a visit with my daughter and her family in Grand Forks. It is about four and one half-hours drive. I stopped twice for coffee and take a break. The drive is pretty much straight and flat.

I have been asked to describe what I do on an average day.  I get up about 7 to 7:30 AM.  I am able to shower, groom and dress myself.  I have coffee and read the newspaper.  I will probably do the dishes from the night before.  I might sweep the floor.  I might do little things such as caulking the windows using a caulking gun or with strips of adhesive insulation.  I might do a little painting on the house.  If it is not too hard of work, I will go two to four hours.  I will take breaks in between.  If my neck or the headaches start to bother me, I will stop.  I will finish at another time.  I try to vacuum and wash my car.  I will do this about twice a month.  I walk to my granddaughter's school, about two blocks, and bring her our home.  I do this about three times a week.  My wife will do it on the other days and on days I am having a bad day.

I am able to go grocery shopping.  I go about every other day for some things.  I read and watch television during the evening.

Once a week, I drive to my visit my mother.  She is in a nursing home.  I visit with her about an hour.

I do mow my own lawn.  In one mowing, it takes about 60 to 80 minutes to mow the front and back.  Sometimes I can do this in one mowing, other times I will take breaks.  About half dozen times this summer, I had to stop and finish the next day.  I take breaks in mowing about half the time.  I use a self-propelled mower.

I have been asked about my social travel, hobbies, and recreational activities.  On weekends, we visit with friends or friends will come to our house.  The only hobby I have is motorcycling.  I try to ride once a week for about 20 to 25 miles if the weather is good.  I have Kawasaki Drifter 805cc.  It a medium size cruiser.  Every year or two we go to Arizona to my wife's family for Christmas.  We fly down.

I have been asked to describe what I do on a good day.  A good day would be a when my headache doesn't turn up.  This physical pain I am able to handle emotionally and physically.  If I am careful what I do, I may have three good days a week.

I have been asked to describe what I do on a bad day.  I wake up and know I must have turned wrong during the night, or, if I strained myself on the previous day.  It is the headaches that causes the bad day.  I will wake up with the headache.  I will try to go into my routine and see if it will let up.  If it doesn't subside within an hour to an hour and a half, I will go lay down.  I will lay down until I start getting depressed.  I will then take a Darvocet.  I might have at least two or more bad days a month.

I have been asked what prevents me from returning to work.  I believe that living with this injury for thirteen years, I can work every other day.  I am eighty to ninety percent sure I can do some light work in that capacity.  My biggest concern, is the frequency of the job, being able to do the job on a daily basis and keep the employer happy.

> I have been asked if there is any type of work I could do.  I would have to see the job
> to see if I could do it.

(AR 1099-1101).

On November 22, 2000, Heather H. Reiss, Hartford Life Investigative Analyst, authored a

letter terminating Sloan's long-term disability benefits explaining that Sloan no longer met the "any

occupation" definition for total disability after August 15, 2000.[4]  (AR 794-795).  The letter states

in relevant part as follows:

> We based our decision to terminate his claim for benefits on Policy language and all
> the documents contained in his claim file, viewed as a whole, including the following
> specific information:
>
> 1.   Statement of claim for Group Long Term Disability Benefits completed by
>      Mr. Sloan and dated 07/01/87.
> 2.   Employer Statement dated and signed on 07/06/87.
> 3.   Attending Physician's Statement signed by Dr. Michael Martire and dated
>      08/04/99.
> 4.   Personal Profile Evaluation completed and signed by Mr. Sloan on 07/03/99.
> 5.   Medical Records from Dr. Michael Martire dating from 06/29/98 through
>      06/01/00.
> 6.   Pharmacy records from Gateway Pharmacy dating from 01/16/97 through
>      08/01/00.
> 7.   Functional Capacity Evaluation (FCE) completed 8/15/00 at Medcenter One
>      Health Systems.
> 8.   Surveillance report and video from Mid-State Claims Service, Inc. for the
>      period of 08/28/00 and 08/29/00.
> 9.   Interview with Hartford Life Insurance's Investigator William Moryto
>      conducted on 11/06/00 and statement signed by Mr. Sloan.
> 10.  Corporate documents from Eclipse Medical, Inc. dated 12/28/93.
> 11.  Letter from Dr. Michael Martire concerning his review of the Functional
>      Capacity Evaluation and dated 10/31/00.

(AR 795).  The letter detailed each item on the list.  (AR 796-799).  Based on that information,

Hartford Life identified the following occupations which it believed Sloan was qualified to perform:

---

[4]Although the letter indicated that benefits would be terminated as of August 15, 2000, it appears that Sloan
received benefits through October 31, 2000.  See Plaintiff's Statement of Material Facts, ¶ 9.

(1) credit card clerk, (2) lost charge card clerk, (3) automobile locator, (4) reservation clerk (travel clerk), (5) sorter (sorts data and/or files), (6) dispatcher, (7) telephone solicitor, (8) plant guide (tour for Industrial Plant), and (9) shipping and receiving weigher.  (AR 799-800).

Sloan, through his former attorney, then informed Hartford Life of his intent to appeal its decision regarding the termination of his long-term disability benefits by way of a letter dated December 19, 2000.  (AR 804-806).  On May 14, 2001, Hartford Life issued a letter upholding Heather Reiss' decision to terminate Sloan's benefits.  In closing, the letter stated as follows:

> We have not received new additional medical documentation beyond August 15, 2000 proving that our determination to terminate Mr. Sloan's LTD benefits was incorrect. At this time, our determination remains unchanged.
>
> We are closing Mr. Sloan's file and no further review will be conducted with respect to his claim.

(AR 791-793).

After being terminated from LTD benefits, Sloan continued to seek medical care.  On December 18, 2001, Sloan reported to Dr. Gregory Peterson at Medcenter One Q & R Clinic in Bismarck, North Dakota.  See Docket No. 11, Ex. B5F-3.  Sloan's symptoms included neck pain and low back pain.  Sloan's medications included Celebrex 200, Propoxyphene, Celexa, Amitripyline 75, and Ambien 10.  Id. at B5F-4.  Dr. Peterson's notes reflect that Sloan had recently returned to work as a part-time courtesy driver in August of 2001.  Id. at B5F-3.  Dr. Peterson diagnosed chronic paracervical neck pain, chronic cervicogenic headaches, findings of C5-6 degenerative disk disease, advanced lumbar degenerative disk disease, chronic mechanical low back pain, and bilateral shoulder degenerative disease.  Id. at B5F-7.  Dr. Peterson made "no findings of radiculopathy, spinal stenosis, spinal instability, spondyloarthropathy, or hip joint pathology."  Id. at B5F-8.

Sloan returned to Dr. Peterson for a follow-up appointment on January 7, 2002.  See Docket

No. 11, Ex. B5F-1.  MRI results showed "a mild C6-7 disc bulge but no evidence of nerve root or spinal cord compression."  Dr. Peterson advised Sloan that it was "safe to continue work within the limits of his tolerance."

On January 25, 2002, Sloan filed an application for Social Security disability benefits.  <u>See</u> Docket No. 11, Ex. B1D-1.  Sloan's claim was originally denied on the basis of res judicata, but was reconsidered on appeal due to a change in the law.  <u>Id.</u> at Ex. B3A-1.

In the meantime, Sloan commenced an action against Hartford Life in the District of North Dakota, South Central District Court, Burleigh County on or about March of 2002.[5]  Sloan sought damages in addition to the reinstatement of his long-term disability benefits.  <u>See</u> <u>Sloan v. Hartford Comprehensive Emp. Benefit Service Co.</u>, Case No. A1-02-049, (D. N.D. 2002) (Docket No. 1.) (hereinafter referred to as "<u>Sloan I</u>").  Hartford Life removed the action to United States District Court for the District of North Dakota.  <u>See</u> <u>Sloan I</u> (Docket No. 2).

Sloan continued to work as a courtesy driver until March 15, 2002.  <u>See</u> Docket No. 11, Ex. B9F-9.  Thereafter, Sloan quit working due to continued pain and fatigue.  Sloan told doctors that he "just could not keep doing what he was doing" and "could not live like that."  <u>Id.</u> at Ex. B9F-9.  On February 12, 2003, Sloan reported to Dr. Patrick Goodman.  After a full examination, Dr. Goodman's notes state, "I don't see that [Sloan] needs to focus on getting work right now as this would be very difficult for him.  He is easily overwhelmed; in fact, I don't see him as ever working as gainfully employed."  <u>Id.</u> at B10F-6.

On March 4, 2003, the parties filed a "Stipulation for Stay of Proceedings, or, in the

---

[5]There are differing accounts of when the action was commenced in state district court.  Sloan states "on or about February 28, 2002," whereas Hartford Life states "on or about March 18, 2002."  <u>See</u> Plaintiff's Statement of Material Facts, ¶ 13; Defendant's Statement of Undisputed Facts, ¶ 23.

alternative, Dismissal Without Prejudice Pursuant to Federal Rule of Civil Procedure 41." See Sloan I (Docket No. 26).  The stated purpose of the stipulation was to allow Sloan to pursue a Social Security disability appeal "because any social security benefits awarded will directly offset any long term disability payments under the employee welfare benefit plan at issue here, favorable or unfavorable resolution of [Sloan's] social security appeal will determine the amount in controversy in this matter will affect the parties' settlement positions."[6] Id.  Following the stipulation, this Court dismissed the action without prejudice on March 5, 2003.[7] See Sloan I (Docket No. 27).

Upon reconsideration, Sloan's application for Social Security benefits was again denied. See Docket No. 11, Ex. B3B-1.  After multiple appeals, Sloan's case was ultimately reopened.[8]  On appeal, Sloan testified at an administrative hearing.  Sloan also introduced a letter authored by Dr. Roger Kennedy on March 26, 2003.  The letter was generated in response to a questionnaire sent to him by Sloan's attorney.  Dr. Kennedy's letter states, in relevant part, as follows:

> #1   I was Claud's treating physician from 1/23/86 through 10/2/89.
>
> #2   I did understand that Claud's work was sedentary but was scheduled in 12-hr shifts with his being able to sit and stand at will.  I couched "other work restrictions" in some specifics to exclude anything other than sedentary work. I also understood that he could only work for very short periods of time without making his pain intolerable.  He was able to work approximately 50% of the expected work shift.
>
> #3   At no time since 3/5/87, has Claud been able to perform even sedentary work on a regular daily basis for 40hrs/week because of his disabling pain.

---

[6]Sloan had filed for Social Security benefits on January 25, 2002.  See Complaint Ex. 5.

[7]In the stipulation, Hartford agreed to waive any statute of limitations defenses that may be available if the case were re-filed, so long as the date of re-filing was within twenty-four (24) months of the date of the signed stipulation.  See Sloan I (Docket No. 26).

[8]Sloan's case was reopened due to the prior use of a disqualified vocational rehabilitation expert.  See Docket No. 11, Ex. B6B-3-4.

#4      His complaints of pain, though unusually severe, seem credible and quite
        reasonable when related to the unusually severe neck injury which he
        sustained.  Some injuries simply cause persistent, disabling pain which may
        not be amenable to treatment.  The mechanism of his injury would seem quite
        consistent with soft-tissue injury to his neck skeletal structures and
        swallowing mechanism - all of which show relatively little structural changes
        on exams, X-rays and scans.

#5      Prescription narcotic medications certainly can dull people's thought
        processes, memory and judgment which in turn can endanger themselves and
        others.  I really can't speak specifically about this in Claud's case.

#6      Yes.  Even frequent position changes at will did not seem to effectively
        alleviate his pain.

#7      Lifting any significant amount of weight, if it increases his pain and interferes
        with his work ability is considered contraindicated, simply as another means
        of making his pain manageable enough that he could continue to work.

...

#9      The need for rest and frequent change of position seems credible and
        reasonable.

See Docket No. 11, B12F.

On December 12, 2003, Administrative Law Judge Holloway issued a decision finding that

Sloan was entitled to disability benefits under the Social Security Act beginning February 5, 1987.

See Complaint, Exhibit Nos. 4 and 5.  The ALJ gave considerable weight to Dr. Kennedy's letter

under the treating physician rule.  Ultimately, the ALJ made the following findings:

1.      The claimant met the insured status requirements of the Act on the date that
        disability has been established in this case.  (20 CFR 404.130).

2.      The claimant has not engaged in any substantial gainful activity since the
        onset of the disability.  (20 CFR 404.1520(b) and 404.1571-6).

3.      The medical evidence establishes that the claimant has severe cervical
        fracture, myofascial pain syndrome, neuralgia and history of myotomy, but
        does not have an impairment or combination of impairments listed in, or
        medically equal to one listed in Appendix 1 to Subpart P, Regulation Number
        4.

4.       The claimant's allegations are credible and persuasive.  (SSR 96-7p).

5.       The claimant retains a residual functional capacity for occasionally lifting and carrying less than 10 pounds in unskilled jobs that permit him to be unavailable for any work activity for 20 percent of each workday due to headaches.  The claimant can sit up to six hours per work day, stand up to four hours per workday and walk up to four hours per workday in jobs that permit him to change postures at will and take unscheduled breaks or rest periods at his own discretion.  He can perform jobs that do not require him to rotate his head at the neck or look up.  (SSR 96-8p).

6.       The claimant is unable to perform his past relevant work, which required either skilled or semi-skilled task completion, or greater exertional function. (20 CFR 404.1520(f)).

7.       The claimant was a younger individual on the date that disability is established.  (20 CFR 404.1563).

8.       The claimant has a high school education.  (20 CFR 404.1564).

9.       The claimant has no transferable skills that might be applied to meet the requirements of other work within his residual functional capacity.  (20 CFR 404.1565 and 404.1568).

10.      Considering the claimant's age, education, vocational background and residual functional capacity, the claimant cannot perform jobs that exist in significant numbers in the national economy.  The decision is reqched within the framework of Medical-vocational Rule 201.28, and supported by expert vocational testimony showing that jobs are reduced to fewer than significant numbers by the claimant's additional limitations within a range of sedentary work.

11.      The claimant has been under a disability as defined by the Social Security Act and Regulations since February 5, 1987.  (20 CFR 404.1520(g)).

Complaint, Ex. 5.

In a "Notice of Award" letter dated January 16, 2004, the Social Security Administration explained that Sloan was entitled to receive benefits no earlier than 12 months prior to his month of filing.  See Complaint, Ex. 6.  Sloan filed this most recent application for benefits on January 25,

2002,[9] resulting in payments beginning in January of 2001.

On January 28, 2005, Sloan filed the present action against Hartford Life in United States District Court for the District of North Dakota.  Sloan seeks reinstatement of long-term disability benefits under the Plan effective November 1, 2000.  <u>See</u> Complaint, ¶ 27.


## III.   <u>CONCLUSIONS OF LAW</u>

The Employment Retirement Income Security Act (ERISA) allows a participant in an ERISA-regulated plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  It is well-established that "[t]he district court's review of plan determinations is *de novo*, unless the plan grants discretionary authority to the plan administrator 'to determine eligibility for benefits or to construe the terms of the plan.'"  <u>Johnson v. U.S. Bancorp Broad-Based Change in Control Severance Pay Program</u>, 424 F.3d 734, 738 (8th Cir. 2005) (quoting <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)).

In the present case, the parties agree that the LTD Plan in question did not grant the plan administrator such discretion.  Thus, it is clear and undisputed that a de novo standard of review applies in this proceeding.  A de novo review is to be done "without giving any deference to the administrator's decision."  <u>Davidson v. Prudential Ins. Co.</u>, 953 F.2d 1093, 1095 (8th Cir. 1992).  Both issues of plan interpretation, as well as fact-based determinations made by the plan administrator, are subject to de novo review.  <u>See</u> <u>Reidl v. Gen. Am. Life Ins. Co.</u>, 248 F.3d 753, 756 (8th Cir. 2001).

---

[9]Sloan previously filed for Social Security benefits in 1988, 1990, and 1995.  <u>See</u> Complaint Ex. 5.

When reviewing an ERISA plan de novo, the Court begins by examining the language of the plan documents.  See Bond v. Cerner Corp., 309 F.3d 1064, 1067 (8th Cir. 2002).  In doing so, the Court must "interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'"  Adams v. Continental Cas. Co., 364 F.3d 952, 954 (8th Cir. 2004) (quoting Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 789-90 (8th Cir. 2002) (citing Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996))).  Each provision should be read consistently with the others and as part of an integrated whole.  Bond v. Cerner Corp., 309 F.3d 1064, 1067-68 (8th Cir. 2002) (quoting DeGeare v. Alpha Portland Indus., 837 F.2d 812, 816 (8th Cir. 1988)).  If the plan is deemed to be ambiguous, then extrinsic evidence may be considered.  Id. at 1068.  It is clear that any ambiguities should be construed against the drafter only as a last step.

The LTD Plan contains the following provision concerning long-term disability benefits:

An Employee will be considered Totally Disabled if, as a direct result of an Injury or Sickness, he is unable to perform the essential duties of his Normal Occupation[10] for any employer.  However, after Monthly Benefits are payable for 24 months, an Employee will be considered Totally Disabled only if he is unable to perform the essential duties of any occupation for which he is or may become suited based on his education, training, or experience, including any education, training or experience received through a Rehabilitative Program.  Proof of Total Disability will be satisfactory if it (1) is in writing and (2) consists of all medical, psychological, educational and vocational information which the Insurance Company considers pertinent to the claim.  After a Totally Disabled Employee has received Monthly Benefits for 6 months, the Insurance Company may require that he submit, at such intervals as necessary, satisfactory proof of the continuance of a disability.

(AR 817) (footnote added).  The LTD Plan provides that benefit payments will cease on the earliest date of the following occurrences:

---

[10]"Normal Occupation" is defined by the LTD Plan as "the occupation, job or work he performed at the time he stopped working just prior to a claim being made under this Policy."  (AR 817).

(1) the date the employee ceases to be Totally Disabled or dies;

(2) when the Employee is not under the care of a physician or not receiving treatment considered reasonable by the Insurance Company;

(3) the date the Employee fails to:

      a.     furnish proof of the continuance of Total Disability when requested by the Insurance Company; or

      b.     submit to an examination requested by the Insurance Company;

....

(AR 818).

Following this provision, Hartford Life terminated Sloan's long-term disability benefits as of August 15, 2000, finding that he was not "totally disabled." Thus, on a de novo review, the question for the Court is the same, namely was Sloan "totally disabled" under the LTD Plan? In other words, was Sloan unable to perform the essential duties of any occupation for which he is or may become suited based on his education, training, or experience, including any education, training or experience received through a rehabilitation program?

Under the LTD Plan, proof of total disability must come in written form, consisting of all medical, psychological, educational and vocational information which Hartford Life considers pertinent to the claim. (AR 817). Once benefits have been established, the employee must continue to supply Hartford Life with proof of continuing disability. (AR 818). Failure to do so can result in termination of benefits. (AR 818). Under such a framework, Sloan has the burden of proving that he was totally disabled as of August 15, 2000. See Brown v. Seitz Foods, Inc. Disability Benefit Plan, 140 F.3d 1198, 1199 (8th Cir. 1998) ("to receive benefits, Brown had to show he had become continuously unable to perform the duties of his occupation...."); Davidson v. Prudential Ins. Co. Am., 953 F.2d 1093, 1094-96 (8th Cir. 1992) (assigning burden of proving entitlement to long-term

disability benefits to the employee where the policy provided that benefits would be paid only the employee was "unable to engage in any and every gainful occupation for which he was reasonably fitted for by education, training and experience"); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 985-86 (6th Cir. 1991).

Having carefully reviewed the entire record, as well as the additional evidence, the preponderance of the evidence reveals that Sloan was totally disabled as of August 15, 2000.  In February of 1987, Sloan quit working at ANG and applied for disability benefits.  The record shows that Sloan has not engaged in full-time employment since that time, which is a time frame of nearly twenty years.  Throughout that time period, Sloan has suffered from chronic and debilitating neck pain, severe headaches, and insomnia.  Sloan has taken numerous medications, at varying dosages, to combat his symptoms.  (AR 909-917).  Sloan is able to perform rudimentary tasks which include driving, washing dishes, sweeping, mowing the lawn, shopping, and other light maintenance around the house and on his automobiles.  (AR 1130-1131).  However, all of these tasks are done in moderation.  (AR 1100).  Sloan's ability to perform any tasks on a day-to-day basis depends upon the severity of his symptoms on that day.  (AR 1101).

There is little question that Sloan's medical condition prevents him from engaging in his prior line of work at ANG.  Prior to the termination of benefits, Sloan's treating physician consistently stated that Sloan "remain[ed] disabled from his prior line of employment."  (AR 1139).  However, at this stage, Sloan must prove he "is unable to perform the essential duties of any occupation for which he is or may become suited based on his education, training, or experience, including any education, training or experience received through a Rehabilitative Program."  (AR 817) (emphasis).

18

The LTD Plan makes no distinction between full-time and part-time employment.  The phrase "any occupation" is ambiguous in that respect.  Several courts have construed similar provisions to include part-time employment.  See Bond v. Cerner Corp., 309 F.3d 1064, 1067 (8th Cir. 2002); Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 186 (1st Cir. 1998); Marecek v. BellSouth Telecommunications, Inc., 49 F.3d 702, 706 (11th Cir. 1995); Shane v. Albertson's Inc. Employees' Disability Plan, 381 F. Supp. 2d 1196, 1203-06 (C.D. Cal. 2005); Sweno v. Liberty Life Assurance Co., No. CIV02-376, 2003 WL 1572006, *4 (D. Minn, Mar. 10, 2003); Hotaling v. Teachers Ins. & Annuity Ass'n of America, 62 F. Supp. 2d 731, 739-40 (N.D. N.Y. 1999); but see Bruce v. New York Life Ins. Co., No. C 00-1516 MMC, 2003 WL 21005313, *6-7 (N.D. Cal. April 28, 2003).  In other words, if the employee can engage in part-time employment, he is unable to receive total disability benefits.  When faced with such an ambiguity, the Court must "interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'"  Adams v. Continental Cas. Co., 364 F.3d 952, 954 (8th Cir. 2004).  As a last resort, the Court is instructed to resolve all ambiguities against the drafter.  See Bond v. Cerner Corp., 309 F.3d 1064, 1067-68 (8th Cir. 2002).

Following the rule of construction prescribed by the Eighth Circuit, the Court finds as a matter of law that the term "any occupation" should be construed to include only other full-time employment.  The ambiguity in question is construed against the drafter, yet consistent with the manner in which a reasonable person under the LTD Plan would have understood the phrase.  With that being said, the preponderance of the evidence reveals that Sloan is unable to engage in any type of full-time employment.

Even if the term "any occupation" is broadly defined to include part-time employment, the Court would reach the same conclusion and result. The record reveals that Sloan attempted part-time employment in 2001. From August of 2001, through March of 2002, Sloan worked as a courtesy driver on an every other day basis. See Docket No. 11, Ex. B5F-3. After taking the job, Sloan complained of increased pain. Id. at Ex. B9F-15. Ultimately, Sloan had to quit working in that capacity due to increased pain and fatigue. Id. at B9F-9. Sloan later told doctors that he "could not live like that." Moreover, doctors recently have stated that Sloan may never be able to engage in gainful employment again. Id. at B10F-6. The record supports a finding that Sloan was unable to perform "any occupation" either on a full-time or part-time basis.

It is clear from the record that Sloan's ability to perform work on a day-to-day basis is wholly dependent on his medical condition that particular day. On a so-called "bad day," Sloan must spend the day lying down. (AR 1101). Sloan is unable to forecast the bad days, but they can occur at least two or more times per month. On a "good day," Sloan is able to handle his condition emotionally and physically. If careful, Sloan may have up to three good days in a week. Sloan speculated that he could work on an "every other day" schedule. The Court expressly finds that Sloan's subjective complaints of pain are credible and persuasive. Although the functional capacity evaluation found that Sloan could engage in full-time employment, the Court finds that such a conclusion is not consistent with Sloan's physical condition nor is it consistent with the preponderance of the evidence in the medical records. The preponderance of the evidence reveals that Sloan was "totally disabled" and unable to engage in any full-time employment as of August 15, 2000. Although not expressly relied upon, the additional evidence submitted by Sloan further supports such a finding.

20

IV.    **CONCLUSION**

For the reasons set forth above, the Court reverses Hartford Life's decision to terminate Sloan's LTD benefits as of August 15, 2000, and orders the reinstatement of those benefits effective November 1, 2000, in the total amount of $32,197 (through May 2006), plus prejudgment interest of six-percent.  The breakdown of the past due disability benefits owed is as follows:

- From November-December 2000, the full amount of LTD benefits amounts to $1,701 per month for a total of **$3,402**;

- Beginning January 2001, through May 2006, Hartford Life owed the sum of $443 per month (original LTD benefits of $1,701, less monthly Social Security disability benefits of $1,258), which equates to 65 months at $443 per month for a total of **$28,795**;

- The total award of past due disability benefits owed from October 1, 2000, through May 31, 2006, amounts to the sum of **$32,197**.

The Court orders that monthly disability benefits continue to be paid to Sloan after an offset for Social Security disability benefits for a total of $443 per month, until Sloan is no longer disabled or until he reaches the age of 65.[11]  The Court further orders an award of reasonable costs and attorney's fees to Sloan.  The plaintiff is ordered to submit such reasonable costs and an application for attorney's fees in accordance with Local Rule 54.1.  The parties are strongly encouraged to informally undertake efforts to resolve the issue of costs and attorney's fees.  The Clerk of Court is ordered to enter judgment in favor of the plaintiff, Claud Sloan.

---

[11]  The Court notes that Hartford Life has received a windfall as a result of Sloan's efforts to pursue Social Security disability benefits.  After January 2001, Hartford Life's LTD benefits to Sloan decreased from $1,701 per month to $443 per month.  This results in a savings in excess of $15,000 per year as a direct result of Sloan's efforts and a resulting savings in excess of $165,000 over the course of Sloan's eligibility for benefits until age 65 or until February 2012.

**IT IS SO ORDERED.**

Dated this 31st day of May, 2006.

/s/ Daniel L. Hovland
Daniel L. Hovland, Chief Judge
United States District Court